UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION – BAY CITY

IN RE:

FREDERICK LEE KNOCHEL, III,    Case No. 22-20911-dob
                                Chapter 7 Proceeding
     Debtor.                   Hon. Daniel S. Opperman
_____/

JULIE RONAN,
     Plaintiff,

v.                              Adversary Proceeding
                                Case No. 22-02036-dob

FREDERICK LEE KNOCHEL, III; FAMILY
CHIROPRACTIC & WELLNESS OF
MIDLAND, PLLC; RELIEF CARE
CHIROPRACTIC OF MIDLAND, PLLC;
CYNTHIA MARIE LINCOLN; AND
THE TOM MCCANN FAMILY, LLC,
     Defendants.
_____/

OPINION REGARDING MOTION FOR SUMMARY JUDGMENT
OF DEFENDANT FREDERICK LEE KNOCHEL, III
AND MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF JULIE RONAN

Introduction

Plaintiff Julie Ronan must prove that Defendant Dr. Knochel willfully and maliciously injured her in order to have his debt to her excepted from discharge. Because the Court concludes collateral estoppel applies as to a jury verdict entered in her favor, the Court grants her Motion for Summary Judgment. Additionally, after a thorough review of the record by the Court, there is no genuine issue of a material fact that Dr. Knochel acted with the requisite intent required by 11 U.S.C. § 523(a)(6), entitling Ms. Ronan to summary judgment.

1

## Findings of Fact

A)  Background

Ms. Ronan and Dr. Knochel have litigated over five years and in three different courts about the allegations made by Ms. Ronan against Dr. Knochel that he sexually harassed her and discriminated against her while she was employed by him.  The first court was the Midland County Circuit Court where a jury returned a verdict of $150,000 in favor of Ms. Ronan and against Dr. Knochel and the Family Chiropractic & Wellness of Midland PLLC.  A judgment in the amount of $243,739.71 was entered on September 4, 2019 and the Defendants appealed to the Michigan Court of Appeals.  At the June 13, 2023 oral argument in this case, counsel for both parties agreed the Michigan Court of Appeals accurately stated the facts.  Accordingly, this Court reproduces those facts as articulated by the Michigan Court of Appeals:

> Plaintiff worked at Family Chiropractic as a receptionist from September 2014 through February 2016.  Knochel owned Family Chiropractic, and the staff typically comprised a receptionist and a massage therapist.  At trial, plaintiff and Knochel gave substantially different accounts of the events at issue in this case.  However, in reviewing the trial court's decision to deny defendants' motion for judgment notwithstanding the verdict (JNOV), we must view "the testimony and all legitimate inferences drawn from the testimony in the light most favorable to [plaintiff]." *Diamond v. Witherspoon*, 265 Mich App 673, 682; 696 NW2d 770 (2005).  Because we must resolve all credibility issues in plaintiff's favor, we will set forth her version of events.
>
> Multiple witnesses testified that Knochel made demeaning comments about women when he was at work and often judged and remembered women by their appearance.  Plaintiff testified that Knochel would make unflattering comments regarding her weight and figure.  On one occasion, Knochel referenced the size of her arms by "flapping my bat wings at me."  Plaintiff was proud of her appearance, but she was self-conscious about her arms.  She told Knochel this, but he "continued going" until plaintiff excused herself and went outside to cry.  Plaintiff testified that when she lost some weight, Knochel told her that she "was a two or three before, and I could be a five or six now," apparently rating her appearance on a scale of 1 to 10.

Knochel continuously introduced sexual conversation at the office. For example, Knochel told plaintiff he was involved in a swinger's community and he sent her an e-mail invitation for a swinger's party, which she declined. Plaintiff testified that Knochel would often joke about how he did not wear underwear because he needed to "give his balls room to breathe." Plaintiff testified that Knochel asked her to call a patient who worked for the local health department to bring condoms for him to her appointment. Plaintiff initially refused, but she made the call after Knochel insisted. When the patient arrived with the condoms, Knochel told plaintiff and the patient that "the small ones weren't gonna fit."

Knochel's behavior went beyond comments. Plaintiff testified that she once returned from a lunch break and heard Knochel having sex in the office. She said that the receptionist from the adjacent office in the building asked her to address the situation because their patients heard the sexual encounter. Knochel would also leave explicit pictures on plaintiff's work computer. Plaintiff arrived to work one day to find photographs of the woman Knochel was seeing, in various states of undress, on her work computer. On another occasion, Knochel saved a picture of a vagina as the desktop home screen to plaintiff's work computer. Plaintiff said that she repeatedly complained to Knochel about his behavior, and he would stop for a time, but "then when it happened again, it escalated."

Knochel would ask plaintiff to give him massages, including rubbing his lower back. Plaintiff testified that on one occasion, Knochel was lying on his stomach and he "wanted me to do his back and go lower down or, "Oh, right there.'" As "it became more and more," plaintiff told Knochel that she "didn't want to touch him." Plaintiff also recalled a time when Knochel ripped a seam in his pants, and he asked her to staple them while he was wearing them even though his "butt cheeks were exposed." Plaintiff suggested that Knochel take the pants off but, after he insisted, she stapled the back of the pants while he had them on.

A business conference in Atlanta ended up being the proverbial final straw. Plaintiff told Knochel she would not be able to attend the conference with him because her daughter had a cheer competition, but Knochel told her she was going to the conference. Knochel initially told plaintiff they would be sharing a room to save money, but after plaintiff expressed her discomfort, Knochel assured her that the hotel room would be a suite with two separate bedrooms. After arriving at the hotel, however, plaintiff learned that Knochel booked one room with two beds rather than a suite. After the front desk told plaintiff there were no other rooms available at the hotel, plaintiff returned to the room, thinking that Knochel was at the conference. Instead, she found him sleeping on the bed with his shirt off and pants undone and it did not appear he was wearing underwear. Plaintiff was upset and screamed at Knochel to wake up. He, in turn, became very upset and called plaintiff "a stupid fucking cunt" and told her she was being paid for the weekend, so she "was gonna do whatever he told me to do." Plaintiff testified that she went down to the lobby and called her aunt, Ruth Rivette, who changed her flight. Ruth testified that plaintiff was "hysterical" and that she was "terrified" of Knochel.

3

Plaintiff testified that she "cried on the plane all the way home" and decided to leave her job. Soon after the trip, plaintiff scheduled a meeting with Knochel to discuss why he booked only one hotel room. Plaintiff's then husband, William Ronan, accompanied her to the meeting because she was afraid to be alone with Knochel. Plaintiff turned in her keys after Knochel refused to meet with plaintiff and her husband in the back rather than in the lobby.

Plaintiff filed this action, alleging sexual harassment and sex discrimination. The trial court denied defendants' motion for a directed verdict on plaintiff's claims. The jury found that defendants had created a hostile work environment and awarded plaintiff $150,000 in noneconomic damages; the trial court entered a judgment in favor of plaintiff accordingly. Defendants filed a motion for a new trial and a motion JNOV. In both motions, defendants argued that the jury's verdict awarding $150,000 in noneconomic damages was excessive. Defendants then filed an amended motion for JNOV, arguing that plaintiff failed to establish a prima facie case of sexual harassment based upon a hostile environment. The trial court denied both motions. This appeal followed.

The parties returned to the Midland County Circuit Court, but not for long. On the day a hearing was set in that Court, Dr. Knochel filed a Chapter 7 Petition with this Court. Thereafter, Ms. Ronan initiated this Adversary Proceeding and now seeks an exception to the discharge of the obligations owed to her by Dr. Knochel, relying on 11 U.S.C. § 523(a)(6).

After answers to Ms. Ronan's Complaint were filed, Dr. Knochel filed his Motion for Summary Judgment arguing that Ms. Ronan's Section 523(a)(2) and (6) Counts should be dismissed.[1] Ms. Ronan responded, and countered with her own Motion for Summary Judgment.

B) Position of the Parties

Dr. Knochel argues that the Midland County Circuit Court did not address the issue of whether he intended to injure Ms. Ronan, a vital element of any Section 523(a)(6) action. As stated in his brief:

> Plaintiff premises Count VI entirely upon the Alleged Findings by the jury in the state court; she relies upon no other alleged facts. Defendant is only aware of the "Jury Verdict Form" (**Exhibit B**), in which the state court jury answered "Yes" to the question, "Did Family Chiropractic & Wellness of Midland, PLLC **AND/OR** Frederick Knochel, III create a sexually hostile, offensive, or

---

[1] Ms. Ronan and Dr. Knochel subsequently stipulated to the dismissal of her Section 523(a)(2) count.

intimidating work environment; or a hostile, offensive, or intimidating work environment based on gender." (Emphasis added.) The "Jury Verdict Form" form does not necessarily find that Defendant did anything (e.g., "and/or" differentiation of defendants), and in no way, shape, or form comes close to decreeing that anyone "willfully and maliciously injured" anyone else, especially under § 523(a)(6).

In this Motion, Defendant is satisfying his initial burden under Rule 56(c) via both **Exhibit B** and its reliance upon Plaintiff's "fail[ure as] the nonmoving party to produce any evidence which would create a genuine dispute for the [trier of fact]. See generally Cox, 53 F.3d at 149-50 (describing Rule 56(c)'s shifting burden). Given this, as the Sixth Circuit so eloquently requires in Cox, it is now time for Plaintiff to "put up or shut up" on the Alleged Findings. See generally id. Plaintiff must "produce evidence that results in a conflict of material fact to be resolved by [the trier of fact]." See id. "[T]he mere existence of a scintilla of evidence" will not cut it. See id. As Defendant is unaware of such, he awaits Plaintiff's production of evidence that "a jury returned a unanimous verdict . . . finding that Defendants willfully and maliciously injured Plaintiff," as represented in ¶ 78 of the Complaint. If Plaintiff cannot produce satisfactory evidence here, then Defendant is entitled to summary judgment on Count VI, too.

Ms. Ronan responded to Dr. Knochel's Motion and filed her own Motion for Summary Judgment. In her pleadings, she detailed the facts as stated by the Michigan Court of Appeals, by citing various portions of the approximate 470 pages of trial transcript attached to her Motion, as well as the actual Michigan Court of Appeals Opinion. She also detailed the facts of the Sixth Circuit Court of Appeals' Opinions of *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455 (6th Cir. 1998) and *Roe v. Boland (In re Boland)*, 946 F.3d 335 (6th Cir. 2020), and applied her analysis of those cases to the instant case. Ms. Ronan asserts that the conclusions of the state court jury, the trial court, and the appeals court, as well as the facts upon which such conclusions were based demonstrate that Dr. Knochel's acts were intentional and that he knew that injury to Ms. Ronan was substantially certain to result from his actions. Ms. Ronan bases her argument upon principles of collateral estoppel framing the issue as whether the trial court judgment after a jury verdict is entitled to preclusive effect because the issue of whether Dr. Knochel's actions of sexual discrimination were willful and malicious for Section 523(a)(6) nondischargeability. Ms. Ronan

5

attaches the Jury Verdict Form to her Motion as an exhibit, in which the jury answered "Yes" to the following question and awarded Ms. Ronan damages in the amount of $150,000.00:

> Did Family Chiropractic & Wellness of Midland, PLLC and/or Frederick Knochel, III create a sexually hostile, offensive, or intimidating work environment; or a hostile, offensive, or intimidating work environment based upon gender.

(Exhibit D, Plaintiff's Motion for Summary Judgment, Docket No. 63). Ms. Ronan asserts that this determination, upon with a motion by Mr. Knochel for directed verdict was denied, and which he was unsuccessful on appeal, establishes the "actually litigated" and "necessarily determined" elements of this final judgment and should be accorded preclusive effect under applicable state and federal collateral estoppel law.

Dr. Knochel replied, reiterating his previous points by emphasizing the lack of direct evidence that he intended to injure Ms. Ronan. He also cited *Sanger v. Busch (n re Busch)*, 311 B.R. 657 (Bankr. N.D.N.Y. 2004) as supporting his argument that claims for sexual harassment do not satisfy the Section 523(a)(6) elements because there is no requirement in those actions to show an intent to injure the creditor.

The Court heard oral arguments on June 13, 2023 and took this matter under advisement. This Opinion is based on the pleadings, attachments to the parties' motions and statements made by counsel at oral argument.

## Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334, 157(a), and E.D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to dischargeability of particular debts).

## Law

### Summary Judgment Standard

Federal Rule of Civil Procedure 56 is made applicable in its entirety to bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056. Federal Rule of Bankruptcy Procedure 7056(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Choate v. Landis Tool Co.*, 486 F. Supp. 774 (E.D. Mich. 1980). The moving party bears the burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The burden then shifts to the nonmoving party once the moving party has met is burden, and the nonmoving party must then establish that a genuine issue of material fact does indeed exist. *Janda v. Riley-Meggs Industries, Inc.*, 764 F. Supp. 1223, 1227 (E.D. Mich. 1991).

### Collateral Estoppel

A bankruptcy court must determine whether applicable state law would give collateral estoppel effect to the state court judgment. *Bay Area Factors v. Calvert* (*In re Calvert*), 105 F.3d 315, 317 (6th Cir. 1997). Under Michigan law, collateral estoppel has been defined by the Michigan Supreme Court:

> Collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was 1) actually litigated, and 2) necessarily determined.

*People v. Gates*, 452 N.W.2d 627, 630 (Mich. 1990) (citations omitted).

An issue may be considered "actually litigated" for collateral estoppel determinations if it "is put into issue by the pleadings, submitted to the trier of fact, and determined by the trier of fact." A trial is not necessarily required. *Latimer v. Mueller & Son, Inc.*, 386 N.W.2d 618, 627 (Mich. Ct. App. 1986). If an issue is essential to the judgment, it is "necessarily determined." *Gates*, 452 N.W.2d at 631.

Section 523(a)(6)

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The United States Supreme Court has stated that a willful and malicious injury occurs only if "the actor intend[ed] 'the consequences of [the] act,' not simply 'the act itself'" and has held that debts arising from negligent or reckless conduct do not fall within the statutory exception. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, 64 (1998) (quoting Restatement (Second) of Torts § 8A cmt. a (1964)); *see also Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 581 (6th Cir. 2001) ("only acts done with the intent to cause injury - and not merely acts done intentionally - rise to the level of willful and malicious injury") (citing *Geiger*, 523 U.S. at 61). In the Sixth Circuit Court of Appeals, the standard for determining whether the actor intended to cause the injury for purposes of § 523(a)(6) is whether the actor 1) desired to cause the consequences of his or her act, or 2) believed that the consequences are substantially certain to result from the act. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999).

A willful and malicious injury "can be inferred through the circumstances surrounding the injury at issue. *"O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000) (citations omitted). However, the discharge exceptions are to be construed narrowly and in favor of the debtor. *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir.

2004) (citing *Meyers v. I.R.S. (In re Meyers)*, 196 F.3d 622, 624 (6th Cir. 1999)). "The party seeking the exception to discharge bears the burden of proof by a preponderance of the evidence." *Id.* at 306 (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

The Sixth Circuit has further refined what constitutes the requisite element of a willful and malicious injury in *Boland*, 946 F.3d at 341-42 by stating that "a debtor willfully and maliciously injures a creditor if, acting without just cause or excuse, he knows or is substantially certain that his actions will cause injury. *Id.* As the *Boland* Court stated:

> The easy part is explaining what "willful and malicious injury" means. A debtor willfully and maliciously injures a creditor if, acting without just cause or excuse, he knows or is substantially certain that his actions will cause injury.
>
> . . .
>
> As *Geiger* emphasizes, a debtor might act intentionally but simply not know that the act will cause injury. That is typically the case with judgments involving negligence. In such cases, the creditor will need to show that the debtor knew injury would result from his actions to except the judgment from discharge.
>
> But the law will sometimes presume that injury results from an act. Such is the case for false statements imputing a lack of chastity, which are defamatory per se. The law presumes that those statements will injure. Thus, all a creditor needs to prove to except a defamation per se judgment from discharge is that the debtor knew the facts which made his statements actionable: that they were false and published without privilege to a third party.

*Id*. at 338 (citations omitted).

In particular, the *Boland* Court analyzed the concept of substantial certainty in its case, with an example to drive home the point:

> The answer is substantial certainty. Section 523(a)(6) only requires the debtor to be substantially certain that an injury will result from his conduct. This is a concept we imported from tort law. In tort law, intent is not "limited to consequences which are desired." It includes consequences which an actor knows are "certain, or substantially certain, " to result from a particular act. For example, although a bank robber might subjectively intend to enrich himself, he is undoubtedly substantially certain this his bank-robbing will injure someone – the bank, accountholders, and so on.

*Id*. at 341 (citations omitted).

The Sixth Circuit refined the *Boland* standard in *MarketGraphics Research Group, Inc. v. Berge (In re Berge)*, 953 F.3d 907 (6th Cir. 2020) by distinguishing the facts in *Boland*, which involved creating child pornography, which is itself the injury, as opposed to knowingly violating a consumer protection law, which does not carry the same inference of intent *Id*. at 920. In *Berge*, MarketGraphics prevailed in a copyright infringement action against the debtor. The debtor subsequently filed a Chapter 7 petition and MarketGraphics sought a determination that its debt was excepted from discharge under 11 U.S.C. § 523(a)(6). Because a willful copyright infringement can be based on merely reckless behavior, there is not necessarily a finding of an intent to harm. *Id*. at 921. As the *Berge* Court stated:

> A knowing violation of consumer protection laws does not carry the same inference of intent as the knowing creation of child pornography. Were we broadly to presume intent to injure from a variety of actions, exemptions to discharge—which are disfavored—would abound in bankruptcy proceedings. We are also mindful of our precedent requiring subjective, not objective, intent to injure.

*Id*. at 920 (citation omitted).

Analysis

Both parties agreed that the Michigan Court of Appeals accurately stated the facts in its May 20, 2021 Opinion. The parties disagree as to the application of these facts with the law under Section 523 (a)(6).

The Plaintiff's state court action was based on the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*, which requires a Plaintiff to prove:

1. the employee belonged to a protected group;
2. the employee was subjected to conduct or communication on the basis of sex;
3. it was unwelcome sexual conduct or communication;

10

4. The unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

5. Respondeat superior.

*Rymal v. Baergen*, 686 N.W.2d 241, 262 (Mich. Ct. App. 2004).

The third and fourth elements are relevant here. The Michigan Court of Appeals addressed each element as follows:

> Defendants argue that plaintiff failed to establish the third element. Defendants maintain that any sexual communication from Knochel was not unwelcome because he and plaintiff talked openly about their personal relationships. Plaintiff was not asked at trial if she discussed her personal relationships with Knochel, but she denied that she discussed any sexual relations with him, contrary to his testimony that she did. "It is for the trier of fact to assess credibility; a jury may choose to credit or discredit any testimony." *Bank of America, NA v. Fidelity Nat'l Title Ins. Co.*, 316 Mich App 480, 512; 892 NW2d 467 (2016). Plaintiff also testified that she repeatedly objected to Knochel's sexual comments. Thus, even assuming plaintiff discussed personal matters with Knochel, it would not defeat her claim that Dr. Knochel's sexual comments were unwelcome.
>
> Defendants also argue that plaintiff failed to establish the fourth element, i.e., that the unwelcome sexual conduct or communication substantially interfered with the employee's employment or created an intimidating, hostile, or offensive work environment. In making this argument, however, defendants overlook plaintiff's testimony about how Knochel's behavior interfered with her employment. She explained that "[i]t was often having to be discussed and talked about and tried to find a remedy to fix it. And, I was constantly going to [Knochel] about how it made me feel, and please stop it, and that's not appropriate." She testified that removing the photos off her work computer and listening to others' complaints of Knochel's behavior was time-consuming. Plaintiff specifically testified that she was unable to complete filing in a timely manner. As to whether there was a hostile environment, Knochel admitted that if the jury believed plaintiff's testimony, some of his actions could be construed as creating an intimidating, hostile, or offensive employment environment. Referring to the Atlanta business conference, defendants also argue that a single incident does not create a hostile work environment. However, this ignores plaintiff's testimony about the unwanted comments and behavior that preceded the conference.
>
> In sum, viewing the evidence in a light most favorable to plaintiff, a reasonable jury could have perceived Knochel's conduct as "substantially

11

interfering with . . . plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Id*. at 394. Therefore, the trial court did not err by denying defendants' motion for JNOV.

Applying the principles of collateral estoppel, the Opinion of the Michigan Court of Appeals sufficiently finds that Dr. Knochel had the requisite intent to harm or injure Ms. Ronan to except the debt he owes her from discharge. The necessary elements were actually litigated and necessarily determined.

*Berge* requires this Court to look at the elements of the Elliott-Larsen Civil Rights Act to determine if the willful and malicious elements of Section 523(a)(6) are included. The last three elements meet this standard by requiring an intent to injure, especially in an employment setting. The injury caused by Dr. Knochel to Ms. Ronan is direct. Dr. Knochel's acts were not just reckless behavior; they were intentional and directed to Ms. Ronan.

Despite the application of collateral estoppel, the Court will continue its independent analysis to determine if the debt owed by Dr. Knochel to Ms. Ronan should be excepted from discharge.

The Court again starts with the facts as recited by the Michigan Court of Appeals. Plaintiff's complained of acts, as gleaned from this Opinion, can be summarized:

1. Dr. Knochel made demeaning remarks about women while at work, judging and remembering them by their appearance.

2. Dr. Knochel made unflattering remarks about Ms. Ronan's weight and figure.

3. In particular, he referenced the size of her arms by flapping her bat wings at her. She was self-conscious about her arms.

4. Ms. Ronan told Dr. Knochel about her self-consciousness, but he continued to do so until she excused herself to go outside and cry.

5. Dr. Knochel told Ms. Ronan that after she lost some weight, she moved from a two or three to a five or six, on a scale of 1 to 10.

6. Dr. Knochel told Ms. Ronan he was involved in a swinger's community and invited her to attend a swinger's party, an invitation she declined.

7. Dr. Knochel told Ms. Ronan he did not wear underwear.

8. Dr. Knochel told Ms. Ronan to call a patient who worked for the local health department to bring condoms for him to her appointment. She initially refused, but he insisted and she made the call. The patient brought condoms, but Dr. Knochel told Ms. Ronan that the condoms were too small.

9. Ms. Ronan returned from lunch and heard Dr. Knochel having sex in the office, an event that caused the receptionist from an adjacent office to ask Ms. Ronan to address the issue because patients in the adjacent office heard the sexual encounter.

10. Dr. Knochel left explicit pictures on Ms. Ronan's work computer.

11. He also left a picture of a vagina as the desk top home screen on Plaintiff's work computer. Ms. Ronan complained about this behavior and Dr. Knochel temporarily stopped, but then started again.

12. Dr. Knochel repeatedly asked Ms. Ronan to give him massages and after a while she told him she no longer wanted to touch him.

13. Despite assurance that Dr. Knochel booked a suite with separate bedrooms to attend a business conference in Atlanta, Ms. Ronan learned that he booked one room with two beds.

13

22-02036-dob    Doc 83    Filed 06/30/23    Entered 06/30/23 10:00:14    Page 13 of 17

14. During the conference, she returned to the room while thinking Dr. Knochel was away, only to find him sleeping on one bed with no shirt, no underwear, and with his pants undone.

15. Ms. Ronan was upset and confronted Dr. Knochel, who told her she was being paid for the weekend and that she should do whatever he told her to do. As a result, Ms. Ronan called her aunt who changed her flight so she could come home early. Because she was hysterical and terrified of Dr. Knochel, she "cried on the phone all the way home". She then decided to leave her job.[2]

Dr. Knochel's argument is that Ms. Ronan has not and cannot present evidence that he intended to harm her to the extent required by Section 523(a)(6). Case law after *Geiger*, notably *Markowitz* and *Boland*, does not support his position. The *Markowitz* Court remanded the case to the Bankruptcy Court to determine whether the debtor knew his legal malpractice would cause injury. The direction given by the Sixth Circuit was to see if a link between the act and result could be made. The same is true in *Boland*, where the Sixth Circuit had little difficulty in connecting the willful act to an injury when that act is known or substantially certain to cause injury. In *Boland*, the Court of Appeals concluded that in knowingly morphing images of real minors into child pornography and displaying those images in court, Boland must have been substantially certain that he would injure the minors.

The same is true in this case. Beyond the collateral estoppel effect of the jury verdict and subsequent affirmation by the Michigan Court of Appeals, the separate and independent review of

---

[2] This summary was taken from the Michigan Court of Appeals' Opinion. The Court has combed the trial transcript attached to Plaintiff's Motion for Summary Judgment and verified the pertinent facts stated in that Opinion. There is no doubt in the Court's view that these events occurred.

the facts by this Court results in the conclusion that Dr. Knochel intended his acts to cause injury within the definition of *Markowitz*, *Boland* and *Berge*.

As detailed, Dr. Knochel committed numerous acts, at least 15, that were substantially certain to injure Ms. Ronan. On numerous times, he was told by her to stop, but he continued. He did not do one or two acts; he did many even after Ms. Ronan requested that he stop. On many occasions, his acts caused Ms. Ronan to be distressed, anxious or apprehensive; on some she physically reacted. Ultimately, she quit her job and a jury determined her damages were $150,000. The Court cannot see a scenario where Dr. Knochel did not know the effect of his intentional acts, or where he was not substantially certain his acts caused harm or injury to Ms. Ronan. The Court has also separated each action and considered whether any one action, standing alone, evidences an intent to injure or harm Ms. Ronan. In some instances, the intent to injure or harm her is not facially evident. This analysis, however, ignores the cumulative effect any combination of acts had on Ms. Ronan. It also ignores the relentless acts of Dr. Knochel and completely discounts his knowledge or intent his acts would have on Ms. Ronan. This Court cannot draw the exact line or point to the exact time when Dr. Knochel's actions met the standards required by Section 523(a)(6), but it can state that prior to the Atlanta trip, Dr. Knochel met the Section 523(a)(6) elements. Before that trip he was substantially certain that his actions caused harm to Ms. Ronan. But he still continued and persisted

Likewise, the *Berge* rationale leads to the same conclusion. The Court finds that Dr. Knochel intended the actions described in this Opinion. He had no just cause or excuse for those actions and the injuries caused by those actions are direct and certainly implied. By the time of the Atlanta business conference, a dozen incidents had occurred that set the stage. Ms. Ronan did not want to go to the conference, but Dr. Knochel insisted. She only relented when he assured her he

would book a suite with separate rooms. Instead, he booked one room with two beds. Although assured by Dr. Knochel that this arrangement would be appropriate, when she returned from a meeting, she found him on the bed with his shirt off and pants undone without underwear. She confronted him, he insulted her, and then told her she was being paid for the weekend, and that she would do whatever Dr. Knochel told her to do. To this Court, this incident meets all the requirements of Section 523(a)(6), *Geiger*, *Mustaine*, *Markowitz*, *Boland* and *Berge*. The previous acts do as well, but the Atlanta business conference is the easiest finding and conclusion to make.

At oral argument, Dr. Knochel's counsel argued that sexual harassment claims cannot qualify for Section 523(a)(6) treatment because an intent to injure is not a necessary element, citing *Busch*, 311 B.R. at 668-69. This argument is not persuasive in this case because *Busch* is not binding on this Court and has since been severely criticized and limited. As pointed out by Ms. Ronan's counsel at oral argument, *Busch* is not only not binding, it is the minority view, citing *Markowitz*, *Boland*, *Basile v. Spagnola (In re Spagnola)*, 473 B.R. 518, 523-24 (Bankr. S.D.N.Y. 2012), and *Rocco v. Goldberg (In re Goldberg)*, 487 B.R. 112, 127 (Bankr. E.D.N.Y. 2013). Moreover, counsel did not address *Markowitz*, *Boland,* or *Berge,* which are binding on this Court, and which mandate a different result. Finally, the facts of this case, as independently reviewed by this Court, leads to the conclusion that Dr. Knochel did have the requisite Section 523(a)(6) intent.

The Court is mindful that exceptions to discharge are to be narrowly construed and applied. *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280 (6th Cir. 1998). The Court is also mindful that trials are favored and that summary judgment is granted in rare cases. In the instant case, the record is complete and shows that there is no genuine issue of material fact that Dr. Knochel acted with the necessary willful intent to inflict a willful and malicious injury to Ms. Ronan. The Court has searched long and hard to find either an acceptable

reason for Dr. Knochel's actions, or for a lack of intent to cause a willful and malicious injury. The Court has also speculated what Dr. Knochel's testimony could be to successfully defend this cause. While the Court could conjure an explanation for one or perhaps two acts, the litany of actions are too extensive, too numerous, and too flagrant for the Court to deny Ms. Ronan's Motion for Summary Judgment. Likewise, Dr. Knochel's Motion for Summary Judgment cannot be granted.

## Conclusion

For the reasons stated in this Opinion, the Motion for Summary Judgment of Ms. Ronan is GRANTED as to Count VI. The Motion for Summary Judgment of Dr. Knochel is DENIED.

Counsel for Plaintiff is directed to prepare an Order consistent with this Opinion and the rules of this Court for entry of orders.

**Signed on June 30, 2023**



/s/ Daniel S. Opperman
**Daniel S. Opperman**
**United States Bankruptcy Judge**